1  ANDREW L. PACKARD (State Bar No. 168690)
   WILLIAM N. CARLON (State Bar No.305739)
2  LAW OFFICES OF ANDREW L. PACKARD
   245 Kentucky Street, Suite B3
3  Petaluma, CA 94952
   Tel: (707) 782-4060
4  Fax: (707) 782-4061
   andrew@packardlawoffices.com
5  wncarlon@packardlawoffices.com

6  Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING
7  PROTECTION ALLIANCE

8                 UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11 CALIFORNIA SPORTFISHING              )  Case No.
   PROTECTION ALLIANCE,                 )
12                                      )  **COMPLAINT FOR DECLARATORY AND**
                                        )  **INJUNCTIVE RELIEF AND CIVIL**
13          Plaintiff,                  )  **PENALTIES**
                                        )
14     v.                               )  **(Federal Water Pollution Control Act, 33 U.S.C.**
                                        )  **§§ 1251-1387)**
15 CANYON ROCK, CO., INC., and WENDEL   )
   TRAPPE,                              )
16                                      )
            Defendants.                 )
17 ─────────────────────────────────────)

18

19         CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its

20 counsel, hereby alleges:

21 I.      **JURISDICTION AND VENUE**

22         1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal

23 Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the

24 Act") against Canyon Rock, Co., Inc. and Wendel Trappe ("Defendants").  This Court has subject matter

25 jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act,

26 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

27 Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen

28 suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C.

Complaint for Declaratory and Injunctive Relief and Civil Penalties
                                        1

§1365(a) (injunctive relief), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2. On November 26, 2019, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("Notice Letter"), and of its intention to file suit against Defendants, as required by the Act. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1). Plaintiff mailed a copy of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1). A true and correct copy of the Notice Letter is attached hereto as **Exhibit A**, and is incorporated by reference.

3. More than sixty days have passed since Plaintiff served the Notice Letter on Defendants and the agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint. This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Intra-district venue is proper in either San Francisco or Oakland, California, because the sources of the violations are located within Sonoma County.

## II.   <u>INTRODUCTION</u>

5. This Complaint seeks relief for Defendants' violations of the CWA at the approximately 80-acre aggregate and rock processing facility located at 7525 Highway 116, in Forestville, California (the "Forestville Facility"), and at the approximately 120-acre aggregate and rock processing facility located at 600 Austin Creek Road, in Cazadero, California (the "Cazadero Facility" and together with the Forestville Facility, the "Facilities"). Defendants discharge pollutant-contaminated storm water

Complaint for Declaratory and Injunctive Relief and Civil Penalties

from the Forestville Facility into storm water conveyances that discharge to Green Valley Creek, which drains to the Russian River.  Defendants also discharge pollutant-contaminated storm water from the Cazadero Facility into storm water conveyances that discharge into Austin Creek, which drains to the Russian River.  Green Valley Creek, Austin Creek and the Russian River (the "Impacted Waters") are waters of the United States within the meaning of the Clean Water Act.  Defendants are in violation of both the substantive and procedural requirements of the CWA.

6.     Defendants' discharges of polluted storm water from the Facilities violate Section 301 of the Act, which prohibits the discharge of storm water associated with industrial activities to waters of the United States except in compliance with the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  These violations are ongoing and continuous.

7.     Defendants' discharges of polluted storm water from the Facilities violate the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 14-0057-DWQ, NPDES General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the permitting, filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

8.     The failure on the part of industrial facility operators, such as Defendants, to apply for and comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Russian River.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the aquatic environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to the impacted waters.

III.   **PARTIES**

9.     Defendant Canyon Rock Co., Inc. is a California corporation doing business as Canyon Rock, Austin Creek Quarry, and River Ready Mix.

10.     Defendant Wendel Trappe is the owner of Canyon Rock Co., Inc. and is identified as the Legally Responsible Person under the General Permit for both Facilities.

11.     Defendants own and operate the Forestville Facility, an approximately 80-acre aggregate and rock processing facility located at 7525 Highway 116, in Forestville, California.

12.     Defendants' primary industrial activities at the Forestville Facility include aggregate and rock material crushing, processing, screening, stockpiling and recycling, and producing ready-mix concrete.  The Forestville Facility also includes a rock quarry, as well as a shop, fueling area, and a network of roads that provide connectivity between the various industrial areas.

13.     The industrial activities at the Forestville Facility fall under Standard Industrial Classification ("SIC") Code 1442 ("Construction Sand and Gravel") and 3273 ("Ready-Mixed Concrete").

14.     Defendants own and operate the Cazadero Facility, and approximately 120-acre aggregate and rock processing facility located at 600 Austin Creek Road, in Cazadero, California.

15.     Defendants' primary industrial activities at the Cazadero Facility include aggregate and rock material crushing, and processing, screening, stockpiling and recycling.  Industrial activities at the Cazadero Facility also include rock quarrying on the open faces of rock east of Austin Creek Road, as well as a shop, fueling area, and a network of roads that provide connectivity between the various industrial areas.

16.     The industrial activities at the Cazadero Facility fall under SIC Code 1442 ("Construction Sand and Gravel").

17.     Plaintiff CSPA is a non-profit public benefit corporation organized under the laws of California, with its main offices in Stockton, California.  CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California waters, including the waters into which Defendants discharge polluted storm water.  To further its goals, CSPA actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

18.     Members of CSPA, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near the Impacted Waters, into which Defendants cause pollutants to be discharged.  These members of CSPA use and enjoy the Impacted Waters for recreational, educational, scientific, conservation, aesthetic and spiritual purposes.  Defendants' discharges of storm water containing pollutants impairs each of those uses.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

19.     Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the Impacted Waters, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities because that relief will significantly reduce pollution discharged from Defendants' Facilities into the Impacted Waters.

20.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## IV.     LEGAL BACKGROUND

### A.     Clean Water Act

21.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ."  33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and a technology-based approach to regulating discharges of

pollutants from point sources into waters of the United States.

22.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits both discharges not in conformance with a NPDES permit, such as discharges without a NPDES permit issued pursuant to Section 402 of the Act (33 U.S.C. §1342) or discharges that violate the terms of an NPDES permit.

23.    The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

24.    A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

25.    "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).  Section 402 of the Act, 33 U.S.C. § 1342, establishes the NPDES program, a permitting program that regulates the discharge of pollutants into waters of the United States.  Section 402(p) establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  33 U.S.C. § 1342(p)(2)(B).  Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges, through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

26.    Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing

actions against any person alleged to be in violation of an effluent standard or limitation); 33 U.S.C. § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

27.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009 and $55,800 per day per violation for all violations that occurred after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4.

**B.     State Regulations**

28.     The Act requires States to promulgate water quality standards.  *See* 33 U.S.C. §§ 1313(a)-(c).  Water quality standards consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses.  33 U.S.C. § 1313(c)(2)(A).  The Act requires States to assess whether these water quality standards are being met.

29.     The Russian River is heavily degraded from pollutant loading.  This is officially recognized by the EPA, the State Board, and the Regional Board, which has placed the waterbody on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards.  The Regional Board's Water Quality Control Plan for the North Coast Region (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as aluminum, arsenic, cadmium, chromium, lead, mercury, nitrate, endrin, benzene, 1,2-dibromo-3-chloropropane, 1,1-dichloroethane, 1,2-dichloroethane, ethylbenzene, heptachlor, and 1,1,2,2-

1    tetrachloroethane.

2        30.    In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"),

3    discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in

4    California's rivers, lakes, enclosed bays, and estuaries.  The CTR applies to the Impacted Waters, and

5    includes limits for several toxic metals, including antimony, arsenic, beryllium, cadmium, chromium,

6    copper, lead, mercury, nickel, selenium, silver, thallium, and zinc.

7        **C.    California Industrial Storm Water General Permit**

8        31.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has

9    authorized California's State Board to issue NPDES permits in California, including general NPDES

10   permits.

11       32.    The State Board elected to issue a statewide general permit for industrial discharges.  The

12   State Board issued the General Permit on or about November 19, 1991, modified the General Permit on

13   or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1,

14   2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

15       33.    Facilities discharging, or having the potential to discharge, storm water associated with

16   industrial activity that have not obtained an individual NPDES permit must apply for coverage under the

17   State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file

18   their NOIs before the initiation of industrial operations.

19       34.    Once regulated by an NPDES permit, facilities must strictly comply with all of the terms

20   and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General

21   Permit, Section XXI.A.

22       35.    In order to discharge storm water lawfully in California, industrial dischargers must

23   comply with the terms of the General Permit or have obtained and complied with an individual NPDES

24   permit.

25       36.    The General Permit contains three primary and interrelated categories of requirements: 1)

26   discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3)

27   monitoring and reporting requirements, including the requirement to prepare an annual report.

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties

37.     Discharge Prohibition III.B of the General Permit prohibits discharges of liquids or materials other than storm water, either directly or indirectly to waters of the United States unless authorized by another NPDES permit or as authorized in Section IV of the General Permit.

38.     Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.

39.     Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.

40.     Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

41.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

42.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids ("TSS") – 100 mg/L; Oil & Grease ("O&G") – 15.0 mg/L; and Iron ("Fe") – 1.0 mg/L.

43.     The Regional Board has established water quality standards for the Impacted Waters in the Basin Plan.

44.     The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."  3-4.00 Basin Plan.

45.     The Basin Plan provides that "[w]aters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in [22

C.C.R. §§ 64435 and 64444.5].'"  3-5.00 Basin Plan.  According to the 2014/2016 303(d) List of Impaired Water Bodies, Russian River Hydrologic Unit, Middle Russian River Hydrologic Area downstream of the Facility is impaired for: Indicator Bacteria, Nitrogen, Dissolved Oxygen, Sediment/Siltation, and Temperature.

46.     EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following applicable numeric limit for freshwater surface waters:  Arsenic – 0.34 mg/L; Cadmium – 0.0043 mg/L; Chromium (III) – 0.55 mg/L; Chromium (VI) – 0.016 mg/L; Copper – 0.013 mg/L; Lead – 0.065 mg/L; Nickel - 0.47 mg/L; Silver – 0.0034 mg/L; and, Zinc – 0.12 mg/L.

47.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

48.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

49.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

50.     Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in

violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

51.     Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

52.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

53.     The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 30).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment.  General Permit, Section XI.B.6.

54.     Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.

General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

55.     Dischargers must submit an Annual Report no later than July 15th following each reporting year, certifying compliance with the General Permit and/or an explanation for any non-compliance.  General Permit, Section XVI.

## V.     STATEMENT OF FACTS

56.   The Forestville Facility is an approximately 80-acre aggregate and rock processing facility and quarry.  A site map of the Forestville Facility is attached as **Exhibit B**.  Defendants' primary industrial activities at the Forestville Facility include aggregate and rock material crushing, processing, screening, stockpiling and recycling, and producing ready-mix concrete.  Most of these industrial activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms, and other storm water controls.

57. The primary industrial activities at the Forestville Facility fall under SIC Code 1442 ("Construction Sand and Gravel") and 3273 ("Ready-Mixed Concrete").

58. Defendants collect and discharge storm water associated with industrial activities at the Forestville Facility through at least two discharge points which drain to Green Valley Creek, a tributary of the Russian River.  Green Valley Creek and the Russian River are waters of the United States within the meaning of the Clean Water Act.

59. Defendants have owned and operated the Forestville Facility since at least 1972.

60. Defendants filed a Notice of Intent to comply with the General Permit on or about June 17, 2015.  The Forestville Facility's Waste Discharge Identification ("WDID") number is 1 49I001091.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

61. On August 13, 2015, Defendants uploaded to the Storm Water Multiple Application & Report Tracking System ("SMARTS") a Storm Water Pollution Prevent Plan ("SWPPP") for the Forestville Facility.

62. On January 25, 2020, Defendants uploaded to SMARTS an amendment to the Forestville Facility's SWPPP.

63. Between August 13, 2015 and January 25, 2020, no other amendments or modifications to the Forestville Facility's SWPPP had been uploaded to SMARTS.

64.     The Cazadero Facility is an approximately 120-acre aggregate and rock processing facility and quarry.  A site map of the Cazadero Facility is attached as **Exhibit C**.  Defendants' primary industrial activities at the Cazadero Facility include aggregate and rock material crushing, and processing, screening, stockpiling and recycling.  Industrial activities at the Cazadero Facility also include rock quarrying on the open faces of rock east of Austin Creek Road, as well as a shop, fueling area, and a network of roads that provide connectivity between the various industrial areas.  Most of these industrial activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms, and other storm water controls.

65. The primary industrial activities at the Cazadero Facility fall under SIC Code 1442 ("Construction Sand and Gravel").

66. Defendants collect and discharge storm water associated with industrial activities at the Cazadero Facility through at least two discharge points which drain to Austin Creek, a tributary of the Russian River.  Austin Creek and the Russian River are waters of the United States within the meaning of the Clean Water Act.

67. On August 13, 2015, Defendants uploaded to SMARTS a SWPPP for the Cazadero Facility.

68. On January 25, 2020, Defendants uploaded to SMARTS an amendment to the Cazadero Facility's SWPPP.

69. Between August 13, 2015 and January 25, 2020, no other amendments or modifications to the Cazadero Facility's SWPPP had been uploaded to SMARTS.

70. Under the General Permit, Defendants have continually sampled storm water discharges from

the Facilities and found levels of pollutants in the samples that exceeded on various occasions both EPA's benchmarks and the CTR values.  This information was reported to the Regional Board, as required by the General Permit.

71. According to Defendants' self-monitoring reports submitted to the Regional Board, Defendants have measured discharges containing levels of TSS and iron in excess of the EPA Benchmark Values on at least twenty-nine occasions since December 5, 2014.

72. Self-monitoring reports filed pursuant to an NPDES permit that report exceedances of permit limitations constitute "conclusive evidence" of violations of the permit and the Act.  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *rev'd on other grounds*, 485 U.S. 931, *amended by* 853 F.2d 667.

73. Plaintiff is informed and believes, and thereupon alleges, that since at least January 27, 2015, Defendants have consistently discharged from their Facilities storm water and non-storm water containing impermissible levels of TSS and iron, and other pollutants associated with Defendants' industrial operations into the Impacted Waters, without complying with the terms of the General Permit.

74. According to Defendants' self-monitoring reports, since at least January 27, 2015, Defendants have known that storm water discharged from the Facilities contains concentrations of: TSS in excess of EPA Benchmark Value of 100 mg/L and iron in excess of EPA Benchmark Value of 1.00 mg/L.

75. On at least seventeen (17) documented occasions since January 27, 2015, the levels of iron detected by Defendants in the storm water discharged from its Cazadero Facility exceeded the Benchmark Value of 1.00 mg/L for iron.

76. On at least two (2) documented occasions since January 27, 2015, the levels of TSS detected by Defendants in the storm water discharged from its Cazadero Facility exceeded the Benchmark Value of 100 mg/L.

77. On at least six (6) documented occasions since January 27, 2015, the levels of iron detected by Defendants in the storm water discharged from its Forestville Facility exceeded the Benchmark Value of 1.00 mg/L for iron.

78. On at least two (2) documented occasions since January 27, 2015, the levels of TSS detected by Defendants in the storm water discharged from its Forestville Facility exceeded the Benchmark Value of 100 mg/L.

79. The Facilities' exceedances of EPA Benchmarks provided above indicate that Defendants have not implemented BAT and BCT at the Facilities for its discharges of TSS and iron.

80. Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

81. The management practices at the Facilities are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.

82. Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facilities directly to the Impacted Waters during significant rain events.

83. Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facilities due to the continued discharge of contaminated storm water.

84. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facilities.

85. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to monitor all of the storm water outfalls at the Facilities, as required by the Permit.  Defendants' failure to designate, and take samples from, every discharge point is a violation of the Permit.

86. Plaintiff is informed and believes, and thereupon alleges, that Defendants have caused or contributed to the impairment of the Russian River by discharging storm water associated with industrial activities from its Facilities with Total Suspended Solids in excess of the applicable water quality standards, such as the EPA Benchmarks.

87. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the

Facilities.  Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, has not sampled all discharge points, has not analyzed the storm water samples collected at the Facilities for all of the required pollutant parameters, and has not used the correct test methods to analyze their storm water samples.

88. Plaintiff is informed and believes, and thereupon alleges, that Defendants have discharged, and continue to discharge, unauthorized non-storm water from the Facility.

89. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

**VI.    CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan For the Facilities
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

90. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

91. Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

92. Defendants have failed to develop and implement an adequate SWPPP for the Facilities. Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facilities is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the failure to identify all discharge locations and drainage areas; the lack of specificity and detail required by the General Permit; the failure to include a compliant site map; the failure to keep the SWPPP updated; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facilities at levels in excess of EPA benchmark values and other applicable standards.

93. Defendants have further failed to update the Facilities' SWPPPs in response to the analytical results of the Facilities' storm water monitoring as required by the General Permit.  General Permit, Sections X.B.1 and X.C.1.b.

94. Defendants continue to violate the Act each day that it fails to develop and fully implement an adequate SWPPP for each Facility.  These violations are ongoing and continuous.

95. Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facilities in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since January 27, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

## SECOND CLAIM FOR RELIEF

**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at the Facilities**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

96. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

97. The General Permit's SWPPP requirements and Effluent Limitation V.A. require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

98. Defendants have failed to implement BAT and BCT at the Facilities for its discharges of Total Suspended Solids and iron in violation of Effluent Limitation V.A. of the General Permit.

99. Defendants' ongoing failure to develop and implement BAT and BCT at the Facilities is evidenced by, *inter alia*, Defendants' chronic exceedances of EPA benchmarks and Defendants' deficient SWPPP.

100.    Each day that Defendants have failed to develop and implement BAT and BCT at the Facilities in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

101.    Defendants continue to be in violation of the BAT and BCT requirements each day that it fails

to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

102.     Defendants have been in violation of the BAT and BCT requirements at the Facilities every day since at least January 27, 2015.  Defendants are subject to civil penalties for each and every violation of the Act since January 27, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

<u>**THIRD CLAIM FOR RELIEF**</u>

**Failure to Develop and Implement an Adequate
Monitoring Implementation Plan for the Facilities
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

103. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

104. Section X.I and Section XI. of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

105.     Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facilities.  Defendants' ongoing failure to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, its continuing failure to collect and analyze storm water samples from all discharge locations, its continuing failure to analyze storm water samples for pollutants likely to be present in the Facilities' storm water discharges in significant quantities and other pollutants as the General Permit requires.  For example, Defendants have not analyzed samples of storm water for levels of nitrate plus nitrite nitrogen, in violation of Monitoring provision XI.B.6.d of the permit.

106. Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facilities each day since at least January 27, 2015.  These violations are ongoing and continuous.

107. Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since January 27, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

**FOURTH CLAIM FOR RELIEF**

**Discharges of Contaminated Storm Water From The Facilities
in Violation of the Permit's Water Quality-Based Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

108. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

109. Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

110. Plaintiff is informed and believes, and thereupon alleges, that since at least January 27, 2015, Defendants have been discharging polluted storm water from the Facilities into the Impacted Waters, in violation of the General Permit's Water Quality-based conditions.

111. During every significant rain event, storm water flowing over and through materials at the Facilities becomes contaminated with pollutants, flowing untreated or insufficiently treated from the Facilities to the Impacted Waters

112. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

113. Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

114. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the

Complaint for Declaratory and Injunctive Relief and Civil Penalties
19

Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit because Defendants' storm water discharges contain high levels of suspended solids which contribute to the Russian River's sediment impairment.

115. Plaintiff is informed and believes, and thereupon alleges, that on every day with significant rainfall since January 15, 2015, Defendants have discharged and continue to discharge polluted storm water from the Facilities in violation of the General Permit. These violations are ongoing and continuous.

116. Every day Defendants have discharged and continue to discharge polluted storm water from the Facilities in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since January 27, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

## VII.    **RELIEF REQUESTED**

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the Facilities not in compliance with a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342, and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA as alleged herein.

b.   Enjoin Defendants from discharging pollutants from the Facilities and to the surface waters surrounding and downstream from the Facilities in violation of the Act and the General Permit;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit and the Act;

d.   Order Defendants to pay civil penalties of $37,500 per day per violation for all violations occurring after January 27, 2015 and $55,800 per day per violation for all violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4;

e.   Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by their activities;

1            f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and

2    consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

3            g.   Award any such other and further relief as this Court may deem appropriate.

4    Dated: January 27, 2020                    Respectfully Submitted,

5                                               LAW OFFICES OF ANDREW L. PACKARD

6                                               By: /s/ William N. Carlon

7                                                    William N. Carlon
                                                     Attorney for Plaintiff
8                                                    CALIFORNIA SPORTFISHING
                                                     PROTECTION ALLIANCE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Law Offices Of

ANDREW L. PACKARD

245 Kentucky Street, Suite B3, Petaluma, CA 94952
Phone (707) 782-4060   Fax (707) 782-4062
Info@PackardLawOffices.com

November 26, 2019

**VIA CERTIFIED MAIL**

Wendel Trappe, Owner                Wendel Trappe, Owner
Canyon Rock, Co., Inc.              7310 Highway 116
P.O. Box 639                        Forestville, CA 95436
Forestville, CA 95436


Re:    **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE**
       **FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")**
       **(33 U.S.C. §§ 1251 *et seq.*)**

Dear Wendel Trappe:

        This firm represents California Sportfishing Protection Alliance ("CSPA") in regard to
violations of the Clean Water Act ("the Act") occurring at Canyon Rock, Co., Inc.'s ("Canyon
Rock") rock quarries and sand and gravel operations located at 7525 Highway 116, in
Forestville, California (the "Forestville Facility") and located at 600 Austin Creek Road, in
Cazadero, California (the "Cazadero Facility"). This letter is being sent to you as the responsible
owner and operator of both enterprises, and as the registered agent for this entity. Unless
otherwise noted, Wendel Trappe and Canyon Rock shall hereinafter be collectively referred to as
"Canyon Rock." The purpose of this letter is to provide Canyon Rock with notice of the
violations of the Industrial General Permit occurring at the Forestville Facility and the Cazadero
Facility (collectively the "Facilities"), including, but not limited to, noncompliant discharges of
polluted storm water associated with industrial activities from the Facilities into local surface
waters.

        Canyon Rock is in ongoing violation of the substantive and procedural requirements of
the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination
System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board
Water Quality Order No. 14-57-DWQ ("General Permit" or "Permit").[1] Prior to July 1, 2015,
Canyon Rock's storm water discharges were regulated under Water Quality Order
No. 91-13-DWQ, as amended by Water Quality Orders 92-12-DWQ and 97-03-DWQ.

---

[1] Canyon Rock submitted a Notice of Intent ("NOI") to comply with the General Permit for the
Forestville Facility on or about June 17, 2015, and for the Cazadero Facility on June 17, 2015.
The Forestville Facility was assigned the Waste Discharge Identification ("WDID") Number 1
49I001091 and the Cazadero Facility was assigned the WDID Number 1 49I024780.

Notice of Violation and Intent To File Suit
November 26, 2019
Page 2

On July 1, 2015 the 2015 General Permit went into effect, superseding the 1997 General Permit that was operative between 1997 and June 30, 2015. The 2015 General Permit includes many of the same fundamental requirements and implements many of the same statutory requirements as the 1997 General Permit. Violation of both the 1997 and 2015 General Permit provisions is enforceable under the law. General Permit, Finding A.6.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects Canyon Rock to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of up to $37,500 per day per violation for all Clean Water Act violations occurring after January 12, 2009 and $54,833 per day per violation for all violations that occurred after November 2, 2015.

In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2.

As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facilities. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, CSPA intends to file suit under Section 505(a) of the Act in federal court against Canyon Rock for violations of the Clean Water Act and the Permit.

## I.    Background.

### A.    California Sportfishing Protection Alliance

CSPA is a non-profit association dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters into which Canyon Rock discharges polluted storm water. Members of CSPA enjoy the waters that the Facilities discharge into, including Green Valley Creek, Austin Creek, and the Russian River. Members of CSPA use and enjoy these waters for fishing, estuarine habitat and the rare, threatened and endangered species it supports, the wildlife habitat, marine habitat, and other designated beneficial uses. The discharge of pollutants from the Facilities impairs each of these uses. Further, discharges of polluted storm water from the Facilities are ongoing and continuous. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Canyon Rock's failure to comply with the Clean Water Act and the General Permit.

Notice of Violation and Intent To File Suit
November 26, 2019
Page 3

### B.      The Clean Water Act.

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Bay Keeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants not specifically allowed by a NPDES permit is illegal. *Ecological Rights Found. v. Pacific Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342

### C.      California's General Permit for Storm Water Discharges Associated with Industrial Activities

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which CSPA refers to as the "1997 General Permit." On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit. For purposes of this notice letter, CSPA refers to the reissued permit as the "2015 General Permit." Accordingly, Canyon Rock is liable for violations of the 1997 General Permit and ongoing violations of the 2015 General Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480-81 (7th Cir. 1982) (relief granted for violations of an expire permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121-22 (D.N.J. 1988) ("Limitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

Industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). 1997 General Permit, Provision E.1; 2015 General Permit, Standard Condition XXI.A. These facilities must file their NOIs before the initiation of industrial operations. *Id.*

Notice of Violation and Intent To File Suit
November 26, 2019
Page 4

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

### D.    Canyon Rock's Forestville Facility

Information available to CSPA indicates that Canyon Rock's industrial activities at the approximately 80-acre Forestville Facility include, but are not limited to: aggregate and rock material crushing, processing, screening, stockpiling and recycling, and producing ready-mix concrete.  The Forestville Facility also includes a rock quarry, as well as a shop, fueling area, and a network of roads that provide connectivity between the various industrial areas.  The industrial activities at the Forestville Facility fall under Standard Industrial Classification ("SIC") Code 1442 ("Construction Sand and Gravel") and 3273 ("Read-Mixed Concrete").

Canyon Rock collects and discharges storm water associated with industrial activities at the Forestville Facility through at least two (2) discharge points into Green Valley Creek, which drains to the Russian River.  Green Valley Creek and the Russian River are waters of the United States within the meaning of the Clean Water Act.

According to the 2014 and 2016 303(d) List of Impaired Water Bodies, the Russian River Hydrologic Unit, Lower Russian River Hydrologic Area, Guerneville Hydrologic Sub-Area, Green Valley Creek watershed downstream of the Forestville Facility is impaired for: Indicator Bacteria, and Dissolved Oxygen.[2]  Polluted discharges from industrial sites, such as the Forestville Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

The areas of industrial activity at the Forestville Facility are sources of pollutants.  The General Permit requires Canyon Rock to analyze storm water samples for TSS, pH, and Oil and Grease.  1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6.  Facilities under SIC Code 1442 must also analyze storm water samples for Nitrate plus Nitrite Nitrogen ("N+N") and facilities under SIC Code 3273 must analyze storm water samples for iron.  1997 General Permit, Tables 1-2; 2015 General Permit Tables 1-2.

### E.    Canyon Rock's Cazadero Facility

Information available to CSPA indicates that Canyon Rock's industrial activities at the approximately 120-acre Cazadero Facility are similar to the Forestville Facility and include, but

---

[2] 2014 and 2016 Integrated Report – All Assessed Waters, *available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml (last accessed November 22, 2017).

Notice of Violation and Intent To File Suit
November 26, 2019
Page 5

are not limited to: aggregate and rock material crushing, and processing, screening, stockpiling and recycling. Industrial activities at the Cazadero Facility also include rock quarrying on the open faces of rock east of Austin Creek Road, as well as a shop, fueling area, and a network of roads that provide connectivity between the various industrial areas. The industrial activities at the Cazadero Facility fall under Standard Industrial Classification ("SIC") Code 1442 ("Construction Sand and Gravel").

Canyon Rock collects and discharges storm water associated with industrial activities at the Cazadero Facility through at least two (2) discharge points into Austin Creek, which drains to the Russian River. Austin Creek and the Russian River are waters of the United States within the meaning of the Clean Water Act.

According to the 2014 and 2016 303(d) List of Impaired Water Bodies, the Russian River Hydrologic Unit, Lower Russian River Hydrologic Area, Austin Creek Sub-Area downstream of the Cazadero Facility is impaired for: Sedimentation/Siltation, and Temperature. Polluted discharges from industrial sites, such as the Cazadero Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

The areas of industrial activity at the Cazadero Facility are sources of pollutants. The General Permit requires Canyon Rock to analyze storm water samples for TSS, pH, and Oil and Grease. 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6. Facilities under SIC Code 1442 must also analyze storm water samples for Nitrate plus Nitrite Nitrogen ("N+N"). 1997 General Permit, Tables 1-2; 2015 General Permit Tables 1-2.

## II.  Canyon Rock's Violations of the Act and Permit.

Based on its review of available public documents, CSPA is informed and believes that Canyon Rock, through its operation of the Facilities, is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Canyon Rock is subject to penalties for violations of the Act since November 26, 2014.

### A.  Canyon Rock Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.

Canyon Rock's storm water sampling results provide conclusive evidence of Canyon Rock's failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations at either of its Facilities. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

### 1.  Applicable Water Quality Standards.

Notice of Violation and Intent To File Suit
November 26, 2019
Page 6

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. 1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. 1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. 1997 General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. 1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id*.

The *Water Quality Control Plan for the North Coast Region (Revised May 2011)* ("Basin Plan") sets forth water quality standards and prohibitions applicable to Canyon Rock's storm water discharges from its Facilities. The Basin Plan identifies present and potential beneficial uses for the Russian River Hydrologic Unit, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

## 2.    Applicable Effluent Limitations.

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F. Supp. 2d 914, 920, 923 (C.D. Cal 2009); 1997 General Permit, Effluent Limitations B.5-6; 2015 General Permit, Exceedance Response Action XII.A.

Notice of Violation and Intent To File Suit
November 26, 2019
Page 7

The following EPA benchmarks have been established for pollutants discharged by Canyon Rock: Total Suspended Solids – 100 mg/L; Oil & Grease – 15.0 mg/L; Iron – 1.0 mg/L; pH – 6.0-9.0 s.u. and Nitrate plus Nitrite Nitrogen – 0.68 mg/L.

### 3. Canyon Rock's Storm Water Sample Results

The following discharges of pollutants from the Forestville Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

### a. Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 3/1/2018 | CRF-W | TSS | 110 | 100 |
| 1/9/2018 | CRF-W | TSS | 130 | 100 |

### b. Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Values

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 3/1/2018 | CRF-W | Fe | 1.4 | 1.00 |
| 3/1/2018 | CRF-N | Fe | 2 | 1.00 |
| 1/9/2018 | CRF-W | Fe | 1.2 | 1.00 |
| 3/22/2017 | CRF-W | Fe | 2 | 1.00 |
| 3/22/2017 | CRF-N | Fe | 1.5 | 1.00 |
| 3/6/2017 | CRF-W | Fe | 2.6 | 1.00 |

The following discharges of pollutants from the Cazadero Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

### c. Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 3/20/2019 | CRC-1 | Fe | 1.5 | 1.00 |
| 12/18/2018 | CRC-1 | Fe | 2 | 1.00 |
| 3/21/2018 | CRC-1 | Fe | 2.7 | 1.00 |
| 3/21/2018 | CRC-2 | Fe | 4.8 | 1.00 |
| 3/2/2018 | CRC-1 | Fe | 2.6 | 1.00 |

Notice of Violation and Intent To File Suit
November 26, 2019
Page 8

| 3/2/2018 | CRC-2 | Fe | 6.5 | 1.00 |
| 1/9/2018 | CRC-2 | Fe | 2.4 | 1.00 |
| 3/22/2017 | CRC-1 | Fe | 2.1 | 1.00 |
| 3/22/2017 | CRC-2 | Fe | 1.6 | 1.00 |
| 3/6/2017 | CRC-1 | Fe | 2.2 | 1.00 |
| 3/6/2017 | CRC-2 | Fe | 5.1 | 1.00 |
| 4/22/2016 | CRC-1 | Fe | 17 | 1.00 |
| 4/22/2016 | CRC-2 | Fe | 5.7 | 1.00 |
| 3/3/2016 | CRC-1 | Fe | 2.3 | 1.00 |
| 2/18/2016 | CRC-1 | Fe | 2.4 | 1.00 |
| 12/22/2015 | CRC-1 | Fe | 6.6 | 1.00 |
| 12/22/2015 | CRC-2 | Fe | 2.4 | 1.00 |
| 12/5/2014 | CYU-U | Fe | 1.9 | 1.00 |
| 12/5/2014 | CYU-L | Fe | 5.9 | 1.00 |

   **d.**   **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 3/2/2018 | CRC-2 | TSS | 130 | 100 |
| 4/22/2016 | CRC-1 | TSS | 190 | 100 |

   **e.**   **Canyon Rock 's Sample Results Are Evidence of Violations of the General Permit**

Canyon Rock's sample results demonstrate violations of the Permit's discharge prohibitions, receiving water limitations and effluent limitations set forth above.  CSPA is informed and believes that Canyon Rock has known that its storm water contains pollutants at levels exceeding General Permit standards since at least November 26, 2012.

CSPA alleges that such violations occur each time storm water discharges from the Facility.  Attachment A hereto, sets forth the specific rain dates on which CSPA alleges that Canyon Rock has discharged storm water containing impermissible levels of TSS, Fe, and N+N in violation of the General Permit.  1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

   **4.**   **Canyon Rock Has Failed to Implement BAT and BCT**

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water

Notice of Violation and Intent To File Suit
November 26, 2019
Page 9

discharges.  1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent
Limitation V.A.  To meet the BAT/BCT standard, dischargers must implement minimum BMPs
and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions
where necessary to reduce or prevent pollutants in discharges.  *See* 1997 General Permit,
Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

Canyon Rock has failed to implement the minimum BMPs required by the General
Permit, including: good housekeeping requirements; preventive maintenance requirements; spill
and leak prevention and response requirements; material handling and waste management
requirements; erosion and sediment controls; employee training and quality assurance; and
record keeping.  Permit, Section X.H.1(a-g).

Canyon Rock has further failed to implement advanced BMPs necessary to reduce or
prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards,
including:  exposure minimization BMPs; containment and discharge reduction BMPs; treatment
control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent
limitations.  1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day that Canyon Rock  have failed to develop and implement BAT and BCT at the
Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of
the Act, 33 U.S.C. § 1311(a).  Canyon Rock has been in violation of the BAT and BCT
requirements at its Facilities every day since at least November 26, 2012.

**5.     Canyon Rock Has Failed to Implement an Adequate Monitoring
Implementation Plan.**

The General Permit requires dischargers to implement a Monitoring Implementation
Plan.  Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm
water discharge locations.  Permit, Section X.I.2.  Dischargers must then conduct monthly visual
observations of each drainage area, as well as visual observations during discharge sampling
events.  General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events
within the first half of each reporting year (July 1 to December 31) and two (2) storm events
during the second half of each reporting year (January 1 to June 3).  General Permit, Section
XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic
parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain
industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants
likely to be in the storm water discharged from the facility based on the pollutant source
assessment.  Permit, Section XI.B.6.  Dischargers must submit all sampling and analytical results
via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section
XI.B.11.

Canyon Rock has failed to develop and implement an adequate Monitoring
Implementation Plan for each of its Facilities.  For example, Canyon Rock has failed to monitor

Notice of Violation and Intent To File Suit
November 26, 2019
Page 10

for every potential pollutant that is likely to be present at its Facilities.  In addition, Canyon Rock
has failed to collect the required number of samples for each reporting period.  Canyon Rock has
also failed to monitor every discharge location of storm water associated with industrial activities
at its Facilities.  Each day that Canyon Rock has failed to develop and implement adequate
Monitoring Implementation Plans is a separate and distinct violation of the Act and Permit.
Canyon Rock has been in violation of the Monitoring Implementation Plan requirements every
day since at least November 26, 2012.

> **6.      Canyon Rock Has Failed to Develop and Implement an Adequate
>            Storm Water Pollution Prevention Plan.**

The General Permit requires dischargers to develop and implement a site-specific
SWPPP.  1997 General Permit, Section A.1; 2015 General Permit, Section X.A.  The SWPPP
must include, among other elements: (1) the facility name and contact information; (2) a site
map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an
assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if
applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance
evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP
amendment, if applicable.  *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the
Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS")
their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify
and submit via SMARTS for any non-significant revisions not more than once every three (3)
months in the reporting year.  2015 General Permit, Section X.B; see also 1997 General permit,
Section A.

CSPA's investigation indicates that Canyon Rock has been operating with an
inadequately developed and implemented SWPPP in violation of General Permit requirements.
For example, Canyon Rock's site maps at both Facilities are wholly inadequate and lack all
required information.  Furthermore, Canyon Rock's use of a generic CASQA template at both
Facilities does not reflect a site-specific approach to storm water management.  The generic
SWPPPs lack requisite details about specific minimum and advanced BMPs at both Facilities.
Canyon Rock has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as
necessary, resulting in the Facility's numerous continuing effluent limitation violations.

Each day Canyon Rock failed to develop and implement adequate SWPPPs at each of its
Facilities is a violation of the General Permit at each Facility.  The SWPPP violations described
above were at all times in violation of Section A of the 1997 General Permit, and Section X of
the 2015 General Permit. Canyon Rock has been in violation of these requirements at its
Facilities every day since at least November 26, 2012.

> **6.      Canyon Rock Has Failed to File Timely, True and Correct Reports.**

Section XVI. of the Permit requires dischargers to submit an Annual Report by July 15th

Notice of Violation and Intent To File Suit
November 26, 2019
Page 11

of each reporting year to the Regional Board.  The Annual Report must be signed and certified by a discharger's Legally Responsible Person, or Duly Authorized Representative.  Permit, Sections XVI.A, XXI.K.  The Annual Report must include a compliance checklist, certifying compliance with the General Permit and an explanation of any non-compliance.  Permit, Section XVI.B.

CSPA's investigations indicate that Canyon Rock has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at its Facilities.

## III.    Persons Responsible for the Violations.

CSPA puts Canyon Rock on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Canyon Rock on formal notice that it intends to include those persons in this action.

## IV.    Name and Address of Noticing Parties.

The name, address and telephone number of each of the noticing parties is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainer Avenue
Stockton, CA 95204
(209) 464-5067

## V.    Counsel.

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
William N. Carlon
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

## VI.    Conclusion

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against Canyon

Notice of Violation and Intent To File Suit
November 26, 2019
Page 12

Rock and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.


Sincerely,


William N. Carlon
Law Offices of Andrew L. Packard
Counsel for CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

Notice of Violation and Intent To File Suit
 November 26, 2019
Page 13

## SERVICE LIST

## VIA CERTIFIED MAIL

        Andrew Wheeler, Administrator
        U.S. Environmental Protection Agency
        1200 Pennsylvania Ave., N.W.
        Washington, D.C. 20460

        Mike Stoker, Regional Administrator
        U.S. Environmental Protection Agency, Region IX
        75 Hawthorne Street
        San Francisco, CA 94105

        William Barr, U.S. Attorney General
        U.S. Department of Justice
        950 Pennsylvania Avenue, N.W.
        Washington, DC 20530-0001

        Eileen Sobeck, Executive Director
        State Water Resources Control Board
        P.O. Box 100
        Sacramento, CA 95812

        Matthias St. John, Executive Officer
        North Coast Regional Water Quality Control Board
        5550 Skylane Boulevard Suite A
        Santa Rosa, CA 95403

**ATTACHMENT A**
**Notice of Intent to File Suit, Canyon Rock**
**Significant Rain Events,\* November 26, 2014 – November 26, 2019**

| | | | |
|---|---|---|---|
| 11/20/2014 | 12/11/2015 | 10/4/2016 | 2/7/2017 |
| 11/21/2014 | 12/13/2015 | 10/25/2016 | 2/8/2017 |
| 11/22/2014 | 12/18/2015 | 10/26/2016 | 2/9/2017 |
| 11/29/2014 | 12/22/2015 | 10/28/2016 | 2/10/2017 |
| 11/30/2014 | 12/24/2015 | 10/29/2016 | 2/16/2017 |
| 12/1/2014 | 1/4/2016 | 10/30/2016 | 2/17/2017 |
| 12/2/2014 | 1/5/2016 | 10/31/2016 | 2/18/2017 |
| 12/3/2014 | 1/6/2016 | 11/1/2016 | 2/19/2017 |
| 12/4/2014 | 1/9/2016 | 11/19/2016 | 2/20/2017 |
| 12/5/2014 | 1/10/2016 | 11/20/2016 | 2/21/2017 |
| 12/6/2014 | 1/13/2016 | 11/23/2016 | 2/22/2017 |
| 12/9/2014 | 1/14/2016 | 11/26/2016 | 3/5/2017 |
| 12/11/2014 | 1/15/2016 | 11/27/2016 | 3/6/2017 |
| 12/12/2014 | 1/16/2016 | 11/28/2016 | 3/7/2017 |
| 12/13/2014 | 1/18/2016 | 12/8/2016 | 3/21/2017 |
| 12/15/2014 | 1/19/2016 | 12/9/2016 | 3/22/2017 |
| 12/16/2014 | 1/20/2016 | 12/10/2016 | 3/24/2017 |
| 12/17/2014 | 1/22/2016 | 12/14/2016 | 3/25/2017 |
| 12/18/2014 | 1/23/2016 | 12/15/2016 | 3/27/2017 |
| 12/19/2014 | 1/24/2016 | 12/16/2016 | 4/7/2017 |
| 12/21/2014 | 1/29/2016 | 12/23/2016 | 4/8/2017 |
| 1/17/2015 | 1/30/2016 | 12/24/2016 | 4/9/2017 |
| 2/6/2015 | 2/18/2016 | 1/3/2017 | 4/12/2017 |
| 2/7/2015 | 2/19/2016 | 1/4/2017 | 4/13/2017 |
| 2/8/2015 | 2/20/2016 | 1/5/2017 | 4/17/2017 |
| 2/9/2015 | 3/3/2016 | 1/7/2017 | 4/18/2017 |
| 4/6/2015 | 3/4/2016 | 1/8/2017 | 4/20/2017 |
| 4/7/2015 | 3/5/2016 | 1/9/2017 | 6/8/2017 |
| 4/8/2015 | 3/12/2016 | 1/10/2017 | 6/9/2017 |
| 4/25/2015 | 3/13/2016 | 1/11/2017 | 10/20/2017 |
| 9/17/2015 | 3/14/2016 | 1/12/2017 | 11/4/2017 |
| 10/28/2015 | 3/21/2016 | 1/19/2017 | 11/9/2017 |
| 11/2/2015 | 3/22/2016 | 1/20/2017 | 11/10/2017 |
| 11/9/2015 | 4/9/2016 | 1/21/2017 | 11/11/2017 |
| 11/10/2015 | 4/10/2016 | 1/22/2017 | 11/13/2017 |
| 11/15/2015 | 4/14/2016 | 1/23/2017 | 11/14/2017 |
| 11/25/2015 | 4/22/2016 | 1/24/2017 | 11/15/2017 |
| 12/4/2015 | 4/23/2016 | 2/2/2017 | 11/16/2017 |
| 12/6/2015 | 5/8/2016 | 2/3/2017 | 11/20/2017 |
| 12/7/2015 | 6/18/2016 | 2/4/2017 | 11/21/2017 |
| 12/10/2015 | 10/3/2016 | 2/6/2017 | 11/26/2017 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Canyon Rock**
**Significant Rain Events,\* November 25, 2014 – November 25, 2019**

| | | |
|---|---|---|
| 11/27/2017 | 12/1/2018 | 3/10/2019 |
| 1/4/2018 | 12/5/2018 | 3/20/2019 |
| 1/5/2018 | 12/15/2018 | 3/21/2019 |
| 1/6/2018 | 12/16/2018 | 3/22/2019 |
| 1/8/2018 | 12/17/2018 | 3/23/2019 |
| 1/9/2018 | 12/19/2018 | 3/26/2019 |
| 1/16/2018 | 12/21/2018 | 3/27/2019 |
| 1/18/2018 | 12/25/2018 | 3/28/2019 |
| 1/19/2018 | 1/6/2019 | 3/29/2019 |
| 1/22/2018 | 1/7/2019 | 4/5/2019 |
| 1/25/2018 | 1/9/2019 | 4/6/2019 |
| 2/26/2018 | 1/10/2019 | 4/7/2019 |
| 3/1/2018 | 1/12/2019 | 4/9/2019 |
| 3/2/2018 | 1/15/2019 | 4/16/2019 |
| 3/3/2018 | 1/16/2019 | 5/15/2019 |
| 3/4/2018 | 1/17/2019 | 5/16/2019 |
| 3/8/2018 | 1/18/2019 | 5/17/2019 |
| 3/13/2018 | 1/19/2019 | 5/19/2019 |
| 3/14/2018 | 1/20/2019 | 5/20/2019 |
| 3/15/2018 | 1/21/2019 | 5/21/2019 |
| 3/16/2018 | 1/31/2019 | |
| 3/17/2018 | 2/2/2019 | |
| 3/21/2018 | 2/3/2019 | |
| 3/24/2018 | 2/4/2019 | |
| 3/25/2018 | 2/5/2019 | |
| 4/6/2018 | 2/9/2019 | |
| 4/7/2018 | 2/10/2019 | |
| 4/12/2018 | 2/12/2019 | |
| 4/13/2018 | 2/13/2019 | |
| 4/16/2018 | 2/14/2019 | |
| 4/17/2018 | 2/15/2019 | |
| 9/30/2018 | 2/16/2019 | |
| 10/2/2018 | 2/17/2019 | |
| 10/3/2018 | 2/26/2019 | |
| 11/21/2018 | 2/27/2019 | |
| 11/22/2018 | 2/28/2019 | |
| 11/23/2018 | 3/2/2019 | |
| 11/24/2018 | 3/3/2019 | |
| 11/28/2018 | 3/6/2019 | |
| 11/29/2018 | 3/7/2019 | |
| 11/30/2018 | 3/9/2019 | |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

# EXHIBIT B

# Canyon Rock Company, Inc.

7525 Highway 116
Forestville, CA 95436

### Legend



**E** Electric Panel

AST

Stormwater Conveyance Flow

Oil Room

First Aid/ Eyewash-Shower

Surface Stormwater Flow Direction

Spill Kit

Hazardous Material Location



**Canyon Rock Company, Inc.**

7525 HIGHWAY 116 FORESTVILLE,
CA 95436

**SWPPP Site Map Vicinity &
Site Boundary
1/5/2020**







**Canyon Rock
Company, Inc.**

7525 Highway
116 Forestville,
CA 95436

### Legend

| | |
|---|---|
| → | *Surface Stormwater Flow Direction* |
| ● | *Discharge Location (2)* (Green Valley Cr.) |
| ┅┅► | *Stormwater Conveyance Flow (Underground)* |
| ★ | *Stormwater Sampling Point* |
| **Oil Room** | *Hazardous Materials Storage Area* |
| | *Drainage Area 1* |
| | *Drainage Area 2* |
| | *AST/ Fueling Area* |
| | *Concrete/ Paved Areas* |
| | *Spill Kit* |

**Stormwater Site Map
(West)**

Scale: 1" ~ 170'
1/5/2020

Wet Pond

Open Quarry Face/ Mining

*Drainage Area 1*

Wet Pond

Wet Pond

Open Quarry Face/ Mining

Open Quarry Face/ Mining

Wet Pond

Open Quarry Face/ Mining

Wet Pond

Rock/ gravel sorting/ cleaning

Raw Materials Storage

Raw Materials Storage

*Drainage Area 2*



# Stormwater Site Map (East)

**Canyon Rock Company, Inc.**
7525 Highway 116
Forestville, CA
95436

**Legend**

- Surface Stormwater Flow (Direction)
- Discharge Location (2) *(Green Valley Cr.)*
- Stormwater Conveyance Flow (Underground)
- ★ Stormwater Sampling Point
- Concrete/ Paved Areas
- Spill Kit
- Hazardous Materials Storage Area
- Drainage Area 1
- Drainage Area 2
- AST/ Fueling Area

Scale: 1" ~ 170'
1/5/2020

Case 3:20-cv-00615-JCS   Document 1   Filed 01/27/20   Page 42 of 46

# EXHIBIT C

**Figure 3.2-2.  Schematic Site Plan**



**Canyon Rock Company, Inc.**

600 Austin Creek Rd.
Cazadero, CA 95421

**SWPPP Site Map Vicinity &
Site Boundary
1/5/2020**





# Canyon Rock Company, Inc.

600 Austin Creek Rd.
Cazadero, CA 95421

## Stormwater Site Map
(1/5/2020)

**Legend**

- Spill Kit
- Stormwater Sampling Point
- Gate/ Road Access
- Diesel AST
- Stormwater Conveyance (surface)
- Stormwater Conveyance (subsurface)
- Hazardous Material Location
- Discharge Point
- Surface Stormwater Flow Direction
- Concrete/ paved surfaces

Oil Room

Scale: 1" ~ 140'

N

Map labels:

- Drop Inlet
- Concrete Batch Plant
- Main Office
- Tractor Parking
- Grease Room
- Office
- Tire Scraper
- Wet Pond
- Batch Plant (abandoned)
- Scale / Office
- Raw Materials Storage
- From non-industrial area NW of active mining area)
- Open Quarry Face/ Mining
- Drainage Area 2
- Drainage Area 1
- Rock/ gravel sorting/ cleaning
- Open Quarry Face/ Mining
- Wet Pond
- D-2
- Austin Creek Rd.
- Austin Creek
- Summer creek access (bermed in winter)
- Drainage Area 3
- CRC – 1
- Wet Pond
- Cazadero Hwy
- Raw Materials Storage
- Wet/ Infiltration Pond
- CRC – 2
- D-1
- Austin Creek
- Vault/ Conveyance Access